# Third District Court of Appeal

## State of Florida

Opinion filed August 22, 2018.
Not final until disposition of timely filed motion for rehearing.

————————————

No. 3D16-2569
Lower Tribunal No. 13-17885

————————————

## Chakra 5, Inc., et al.,
Appellants,

vs.

## The City of Miami Beach,
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Gisela Cardonne Ely, Judge.

Kozyak Tropin & Throckmorton, LLP, and Thomas A. Tucker Ronzetti, Harley S. Tropin, and Tal J. Lifshitz, for appellants.

Raul J. Aguila, City Attorney, and Robert F. Rosenwald, Jr., First Assistant City Attorney; Carlton Fields Jorden Burt, P.A., and Alix Cohen, for appellee.

Before LAGOA, EMAS, and SCALES, JJ.

LAGOA, J.

Appellants, Chakra 5, Inc. ("Chakra 5"), 1501 Ocean Drive, LLC ("1501"),

and Haim Turgman ("Turgman") (collectively, "Appellants"), appeal the trial

court's final order dismissing with prejudice their claims against the City of Miami Beach (the "City"). Additionally, the City has moved to dismiss the appeal with respect to Chakra 5 and 1501 because of their administrative dissolution by the Florida Secretary of State. For the reasons set forth below, we deny the City's motion to dismiss the appeal. In addition, we affirm in part and reverse in part the trial court's final order. Specifically, we affirm the trial court's dismissal with prejudice with respect to claims based on injuries alleged to have occurred before May 20, 2009, as they are time barred. Additionally, we affirm the dismissal with prejudice of any claims asserting a violation of substantive due process, regardless of when the underlying events occurred. Finally, we reverse the dismissal with prejudice with respect to claims asserting a violation of procedural due process based on injuries alleged to have occurred after May 20, 2009.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

In early 2006, Turgman organized 1501 and Chakra 5 to purchase and operate an entertainment complex located in Miami Beach (the "Club"). The purchase was financed in part by a loan from a bank, which took a security interest in the Club. Appellants allege that, shortly after they took ownership of the Club,

---

[1] Our summary of the factual background comes from the amended complaint. On review of a motion to dismiss, we view the factual allegations in the complaint in the light most favorable to the plaintiffs. See Cortez v. Palace Resorts, Inc., 123 So. 3d 1085, 1088 (Fla. 2013); Siegle v. Progressive Consumers Ins. Co., 819 So. 2d 732, 734-35 (Fla. 2002).

2

the City, through its code enforcement department, initiated a "campaign of harassment" against the Appellants, with the aim to extort bribes from them.

As alleged, City code enforcement inspectors unfairly enforced the City's existing building, zoning, fire and tax regulations against the Club. Prior to May 20, 2009, City inspectors allegedly:

(1) delayed, from July 4, 2006, through December 11, 2006, the issuance of a conditional use permit required for the Club to open;

(2) conducted "successive, pre-textual inspections" after the Club opened in December 2006;

(3) shut the Club down for operating past midnight on January 26, 2007, even though the Club's permit authorized it to be open until 5:00 a.m., and required Turgman to pay $3445 to operate until 5:00 a.m.;

(4) visited the Club several times per week during the first half of 2007 and issued two citations during this time period—one for violating the City's noise ordinance when the Club was not open and one for not turning on a rooftop sign;

(5) after a lull in inspection activity after Turgman changed the Club's name and management staff, the City code enforcement staff resumed their prior level of inspections in September 2008 after discovering Turgman's continuing involvement with the Club;

(6) on November 20, 2008, City code enforcement issued a cease and desist order prohibiting the Club's operations for not having code-compliant fire exits, even though the City had approved the construction plans of a neighboring establishment to remove the Club's fire exits; and

(7) after Turgman notified the City in writing of his intent to sue for the closure of the Club, the City monitored every event held at

3

the Club, and in many instances, City inspectors orally ordered Turgman to not let people inside or to shut down the Club.[2]

The following actions allegedly occurred after May 20, 2009:

(1) in February 2010, a City official informed organizers planning an event at the Club that the Club would be shut down the night of their event, due to a failure to pay past due resort taxes; Appellants subsequently entered into a payment plan with the City to avoid the closure;

(2) Turgman was fined $1800 for event flyer litter violations resulting from a March 2010, Winter Music Conference event over a month after that event occurred; and

(3) on June 3, 2011, the City's Lead Code Compliance Officer, code inspector Jose Alberto, solicited an initial bribe from Turgman, followed by numerous other bribes Turgman paid to various City employees.[3]

Finally, at a date not specifically alleged in the amended complaint, City officials decided they wanted to permanently put the Club out of business and directed code enforcement to do whatever was necessary to achieve that goal.[4] Appellants allege that this decision was due to Turgman's unwillingness to contribute to certain City officials' election campaigns or to provide them favors.

_____

[2] In the amended complaint, Appellants do not allege specific dates where the Club was improperly forced to shut down after the City's monitoring began.

[3] The amended complaint alleges that many of these officials who received bribes were convicted in federal court as a result of an FBI investigation.

[4] When City officials allegedly committed this act is unclear, but Appellants allege they learned about it in 2011 when they were solicited for bribes.

Allegedly as a result of the City's actions, Appellants suffered significant financial losses, and in 2010, defaulted on the loan secured by the Club. The lender subsequently took possession of the Club and sold it at a May 26, 2012, auction.

On May 20, 2013, Appellants filed the instant action against the City and the seven City employees involved in the alleged extortion scheme. On October 23, 2015, Appellants filed their amended complaint, which included two counts against the City under 42 U.S.C. § 1983 (2012) asserting deprivation of their rights to substantive and procedural due process.

In response to the amended complaint, the City filed a motion to dismiss, asserting that: (1) Appellants failed to state a cause of action; (2) the statute of limitations barred Appellants' injuries prior to May 20, 2009; and (3) Chakra 5 and 1501 could not proceed with their claims because they had been administratively dissolved. After holding a hearing on the matter, the trial court entered a final order dismissing the counts against the City with prejudice and dismissing the City from the case.[5] This appeal ensued.

---

[5] Although a third count against certain individual defendants remains pending below, we treat the order as a partial final judgment immediately appealable pursuant to Florida Rule of Appellate Procedure 9.110(k).

## II. STANDARD OF REVIEW

We review de novo an order granting a motion to dismiss with prejudice. Falkinburg v. Village of El Portal, 183 So. 3d 1189, 1191 (Fla. 3d DCA 2016). We are bound by the same restrictions the trial court faced when it ruled on the motion to dismiss, and we therefore treat as true all of the well-pled allegations of the complaint, including its incorporated attachments, and "look no further than the complaint and its attachments." Id.

## III. ANALYSIS

We first consider the City's argument that because Chakra 5 and 1501 were administratively dissolved by the Florida Secretary of State, this appeal with respect to those entities should be dismissed or, alternatively, the trial court's order should be affirmed under the "tipsy coachman" doctrine. Second, we address whether Appellants' claims are barred by the statute of limitations and whether they fail to state a claim.[6]

### A. Administrative Dissolution of the Entity Appellants

Chakra 5 and 1501 are a Florida corporation and a Florida limited liability company, respectively. Although not relied upon by the trial court in dismissing

---

[6] In its order, the trial court dismissed the counts against the City with prejudice because "[a]ny amendment as to the City would be futile since, *among other grounds*, the alleged acts occurred more than four years before plaintiff filed its original complaint." (emphasis added) We therefore address whether Appellants failed to state a claim, as the City argued it below and the trial court expressly referred to "other grounds" supporting dismissal with prejudice in its final order.

the City from the instant case, the City has argued, both here and below, that Chakra 5 and 1501 cannot maintain suit either in the trial court or on appeal because they have been administratively dissolved by the Florida Secretary of State. Accordingly, the City argues that their appeal should be dismissed or, alternatively, that the trial court's dismissal as to these two entities should be affirmed under the "tipsy coachman" doctrine, i.e., that the trial court was right for the wrong reason. E.g., Porter v. Porter, 913 So. 2d 691, 694 (Fla. 3d DCA 2005).

Appellants' appendix to their reply includes two certificates of status, which we take judicial notice of,[7] from the Florida Secretary of State showing that both Chakra 5 and 1501 have been reinstated and are now active. As this Court has previously stated:

> The sanctions authorized for failing to file an annual report—involuntary dissolution and the inability to carry on any business, including bringing or defending a lawsuit, other than that necessary to wind up its affairs under sections 607.1420 and 607.1421—are intended to benefit the State, not third parties outside the corporation/State relationship. Hence, the [defendants], "who are strangers to the dealings between plaintiff and

---

[7] See Schriver v. Tucker, 42 So. 2d 707, 709 (Fla. 1949) ("This court will take judicial notice . . . of the records of extradition proceedings on file in the office of the Secretary of State. And the failure of the lower court to take judicial notice of these records does not necessarily prevent this court from so doing." (citation omitted)); see also § 90.202(5), (12), Fla. Stat. (2018) (permitting a court to take judicial notice of "[o]fficial actions of the . . . executive . . . department[] . . . of any state . . . of the United States" and "[f]acts that are not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned").

7

the State, should not be allowed to take advantage of the plaintiff's default . . . to escape their own obligations to the plaintiff."

Allied Roofing Indus., Inc. v. Venegas, 862 So. 2d 6, 9 (Fla. 3d DCA 2003) (quoting Cosmopolitan Distribs., Inc. v. Lehnert, 470 So. 2d 738, 739-40 (Fla. 3d DCA 1985)); see also Bldg. B1, LLC v. Component Repair Servs., Inc., 224 So. 3d 785, 788 (Fla. 3d DCA 2017). Venegas is clear that when the issue of an entity's status with the Florida Secretary of State is raised, the appropriate course by a trial court is to abate the action for a brief period of time to permit compliance with the statute; only after a failure to comply within a reasonable time may sanctions such as dismissal be considered. Venegas, 862 So. 2d at 9.

Accordingly, as Chakra 5 and 1501 are now reinstated, the litigious disability has been cured. E. Invs., LLC v. Cyberfile, Inc., 947 So. 2d 630, 631-32 (Fla. 3d DCA 2007) ("The language of the statute suggests that any failure to comply simply prevents a plaintiff from prosecuting the action, a disability that can be remedied at any point."); Indus. Nat'l Mortg. Co. v. Blake, 406 So. 2d 103, 104 (Fla. 3d DCA 1981) ("Industrial National could have overcome its litigious disability by the simple expedient of filing the overdue reports and paying the back taxes."); accord § 607.1422(3), Fla. Stat. (2013) ("When the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution and the corporation resumes carrying on its business as

8

if the administrative dissolution had never occurred."); § 605.0715(4), Fla. Stat. (2013) ("When reinstatement under this section becomes effective: (a) [t]he reinstatement relates back to and takes effect as of the effective date of the administrative dissolution[; and] (b) [t]he limited liability company may resume its activities and affairs as if the administrative dissolution had not occurred."). Accordingly, we conclude that dismissal of the appeal is inappropriate on this ground. [8]

The issue remains, however, whether the trial court, at the time it issued its final order, would have been correct in dismissing the entities' claims due to their administrative dissolution, as Chakra 5 and 1501 were reinstated only after this appeal was taken. Based on our review of the record, the City first raised this issue in its motion to dismiss the amended complaint, and the record does not show that the trial court granted the entities a period of time in which to correct the deficiency. Under <u>Venegas</u>, dismissal by the trial court would not have been appropriate, and we therefore reject application of the "tipsy coachman" doctrine as a basis to affirm the trial court's dismissal order.

B.    <u>The Dismissal of Appellants' Amended Complaint</u>

---

[8] Because Chakra 5 and 1501 have been reinstated, we need not address the ancillary argument raised by the City that the instant suit is not the sort of suit that is permitted as part of winding up.

In their amended complaint, Appellants brought two claims against the City under 42 U.S.C. § 1983, alleging violations of their constitutional rights to substantive and procedural due process. The trial court dismissed the case against the City with prejudice, finding that "[a]ny amendment as to the City would be futile since, among other grounds, the alleged acts occurred more than four years before plaintiff filed its original complaint." Upon review of the record, the trial court's phrase "other grounds" appears to refer to the City's argument that Appellants failed to state a claim under § 1983. Accordingly, we address each ground separately. First, we address the application of the statute of limitations. Second, we address whether the Appellants stated a claim under § 1983.

1.  *Statute of Limitations*

Section 1983 provides for concurrent state and federal court jurisdiction. While § 1983 provides a federal cause of action, "in several respects . . . federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: It is that which the State provides for personal-injury torts." Wallace v. Kato, 549 U.S. 384, 387 (2007). In Florida, the limitations period for a § 1983 claim is four years. Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003).

The application of the statute of limitations to a claim is a question of fact. Saltponds Condo. Ass'n v. McCoy, 972 So. 2d 230, 231 (Fla. 3d DCA 2007). As our sister court has concluded:

> the statute of limitations and laches are affirmative defenses which should be raised by answer rather than by a motion to dismiss the complaint; and only in extraordinary circumstances where the facts constituting the defense affirmatively appear on the face of the complaint and establish conclusively that the statute of limitations bars the action as a matter of law, should a motion to dismiss on this ground be granted. Since the statute of limitation[s], being an affirmative defense, may be avoided by facts alleged in a reply, in order to grant the motion to dismiss the allegations of the complaint must also conclusively negate any ability on the part of the plaintiff to allege facts in avoidance of the applicable statute of limitations by way of the reply.

Rigby v. Liles, 505 So. 2d 598, 601 (Fla. 1st DCA 1987) (citations omitted); accord Saltponds, 972 So. 2d at 231. Thus, we must review the specific allegations of the amended complaint to determine whether the trial court could adjudicate the limitations issue via a motion to dismiss.

As set forth above, Appellants allege that several injuries occurred before May 20, 2009 (i.e., four years before filing of the complaint), some after May 20, 2009, and others at an unknown date. Appellants' claims based on injuries alleged to have occurred after May 20, 2009, fall within Florida's four-year limitations period and the trial court should not have dismissed them as time barred. Additionally, the trial court should not have dismissed the claims based on injuries

11

for which no date is alleged in the amended complaint as time barred, as it was not conclusive on the face of the amended complaint that those injuries occurred outside of the limitations period.

With respect to injuries that allegedly occurred before May 20, 2009, we must determine whether claims based on those injuries accrued outside the limitations period and are therefore time barred. "[T]the accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." Wallace, 549 U.S. at 388 (emphasis in original). Under federal law, "[a] cause of action under [§ 1983] will not accrue, and thereby set the limitations clock running, until the plaintiffs know or should know (1) that they have suffered the injury that forms the basis of their complaint and (2) who has inflicted the injury." Chappell, 340 F.3d at 1283. Appellants do not contend that, upon occurrence of each injury, they did not immediately know of the injury and who had inflicted it. Thus, on the face of the amended complaint, the claims against the City based on injuries occurring prior to May 20, 2009, fall outside the limitations period and are therefore time barred, absent the application of some doctrine that would save the claims with respect to those injuries.

In this regard, we find Amin Ijbara Equity Corp. v. Village of Oak Lawn, 860 F.3d 489 (7th Cir. 2017), instructive in its application of the federal accrual rule. In Amin, a mall owner brought a § 1983 action against the city and two of its

officials, alleging that the city harassed it by, inter alia, issuing baseless citations and requiring costly renovations. Id. at 492. As a result, the financial health of the mall and its corporate owner deteriorated until the lender foreclosed on the property and took possession of the property. Id. The defendants moved to dismiss the case as time barred based on the complaint's allegations. Id. The district court dismissed the case, and the Seventh Circuit affirmed. Id. at 492, 494. In determining when the cause of action accrued under the federal rule, the Seventh Circuit found that each act of harassment "inflicted a cognizable injury almost immediately: he was forced to make costly and unnecessary repairs and sustained losses in revenue from tenants." Id. at 493. As such, the claim accrued when those injuries occurred, and certainly no later than when the owner lost possession of the mall during the foreclosure when a receiver was appointed. Id. The Seventh Circuit specifically rejected the contention that the owner's claim accrued when the final judgment of foreclosure was entered, almost a year after the receiver was appointed. Id. at 493-94. Because the owner filed suit more than two years (the applicable limitations period in Illinois) after the receiver was appointed and possession was lost, the Seventh Circuit concluded that the trial court was correct in dismissing the case on statute of limitations grounds. Id.

In response, Appellants assert that the doctrine of continuing tort applies with respect to those injuries outside the limitations period. In applying this

doctrine to § 1983 actions, we look to Florida law.  Mullinax v. McElhenney, 817 F.2d 711, 716 (11th Cir. 1987).  Florida law provides that "'[a] continuing tort is "established by continual tortious *acts,* not by continual harmful effects from an original, completed act."'"  Effs v. Sony Pictures Home Entm't, 197 So. 3d 1243, 1245 (Fla. 3d DCA 2016) (quoting Suarez v. City of Tampa, 987 So. 2d 681, 686 (Fla. 2d DCA 2008)).  "'When a defendant's damage-causing act is completed, the existence of continuing damages to a plaintiff, even progressively worsening damages, does not present successive causes of action accruing because of a continuing tort.'" Suarez, 987 So. 2d at 686 (quoting *In re* Med. Review Panel for Claim of Moses, 788 So. 2d 1173, 1183 (La. 2001)).  A continuing tort is thus perhaps best understood as a tort in which the wrong cannot be described as a discrete event.  See Effs, 197 So. 3d at 1244-45; cf. Amin Ijbara Equity, 860 F.3d at 493 (finding that each act of harassment "inflicted a cognizable injury almost immediately").  Applied to this case, Appellants have not alleged a continuing tort, but instead a series of discrete acts of varying kinds.  As noted above, each act constituted a separate, cognizable injury to Appellants that Appellants could have sued on at the time each incident occurred.  The fact that multiple discrete acts occurred over a period of time does not convert those acts into a continuing tort under Florida law.  Instead, successive causes of action accrued from each alleged violation of Appellants' due process rights.  The continuing tort doctrine therefore

14

does not apply to Appellants' claims, and their claims based on injuries occurring before May 20, 2009, are untimely.

Thus, with respect to the statute of limitations, the trial court correctly concluded that Appellants' claims based on injuries occurring before May 20, 2009, were untimely, but erred in determining that the portion of Appellants' claims based on injuries occurring after May 20, 2009, as well as injuries without a clearly alleged date, were untimely.

2. *Due Process Claims*

We now turn to whether Appellants stated a claim under § 1983. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). A plaintiff asserts a claim under § 1983 against a municipality by alleging: (1) a deprivation of a constitutional right; (2) the municipality had a policy that amounts to "deliberate indifference" to that right; and (3) the policy caused the constitutional violation. See City of Canton v. Harris, 489 U.S. 378, 388-91 (1989); Exec. 100, Inc. v. Martin County, 922 F.2d 1536, 1541 (11th Cir. 1991).

As noted by the United States Supreme Court, the first step in assessing any such claim "is to identify the specific constitutional right allegedly infringed." Albright, 510 U.S. at 271. Here, Appellants assert that the City violated their

rights to substantive and procedural due process. Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court's interpretation of this clause "explicates that the amendment provides two different kinds of protection: procedural due process and substantive due process." McKinney v. Pate, 20 F.3d 1550, 1555 (11th Cir. 1994) (en banc) (citing Zinerman v. Burch, 494 U.S. 113, 125 (1990)).

a. *Substantive Due Process*

As noted by the United States Court of Appeals for the Eleventh Circuit, the "substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" McKinney, 20 F.3d at 1556 (quoting Palko v. Connecticut, 302 U.S. 319, 325 (1937)). The United States Supreme Court has cautioned that "[a]s a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992). As stated by the Court in Michael H. v. Gerald D., 491 U.S. 110 (1989):

> It is an established part of our constitutional jurisprudence that the term "liberty" in the Due Process

16

> Clause extends beyond freedom from physical restraint. Without that core textual meaning as a constraint, defining the scope of the Due Process Clause 'has at times been a treacherous field for this Court," giving "reason for concern lest the only limits to . . . judicial intervention become the predilections of those who happen at the time to be Members of this Court.

Id. at 121(citations omitted) (quoting Moore v. East Cleveland, 431 U.S. 494, 502 (1977) (plurality opinion)).

Substantive due process analysis has two features. First, as noted above, the Due Process Clause "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and traditions,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (citations omitted) (quoting Moore, 431 U.S. at 503, and Palko, 302 U.S. at 325-26). Second, substantive due process analysis requires a "'careful description' of the asserted fundamental liberty interest." Id. at 721. "A finding that a right merits substantive due process protection means that the right is protected 'against a certain government action regardless of the fairness of the procedures used to implement them.'" McKinney, 20 F.3d at 1556 (quoting Collins, 503 U.S. at 125).

As noted by the Eleventh Circuit in McKinney, the United States Supreme Court has deemed most of the rights enumerated in the Bill of Rights to be

fundamental, as well as certain unenumerated rights not found in the constitutional text. 20 F.3d at 1556. Regarding those unenumerated rights, the United States Supreme Court has noted that the "protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." Albright, 510 U.S. at 272; see also Washington, 521 U.S. at 720.

Here, Appellants do not allege a violation of a right enumerated in the Bill of Rights and applied to the States via the Fourteenth Amendment. Instead, Appellants assert that they have a constitutionally protected interest to pursue an occupation, an unenumerated right differing in kind from those mentioned in Albright and Washington. As noted earlier, substantive due process analysis requires a "careful description" of the asserted interest at issue. Thus, as discussed below, we believe that Appellants have mischaracterized the interest at stake here, which is more properly viewed as a case challenging the improper enforcement of a municipality's zoning or land use regulations. Nonetheless, Appellants' substantive due process claims fail under either characterization.

In Conn v. Gabbert, 526 U.S. 286 (1999), the United States Supreme Court acknowledged that "[i]n a line of earlier cases, this Court has indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment,

18

but a right which is nevertheless subject to reasonable governmental regulation." Id. at 291-92 (citing Dent v. West Virginia, 129 U.S. 114 (1889), and Truax v. Ratch, 239 U.S. 33, 41 (1915)); see also Greene v. McElroy, 360 U.S. 474, 492 (1959) ("[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable government interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment.")

We find these cases offer little support to Appellants' claims here. In Conn, the Court concluded that the use of a subpoena to temporarily interfere with a lawyer's ability to represent his client "whether calculated to annoy or even to prevent [the attorney's] consultation with a grand jury witness" did not violate the Fourteenth Amendment. 526 U.S. at 293. In Greene, unlike here, the plaintiff alleged a complete inability to obtain work in his desired occupation.

Moreover, this Court, in the context of a procedural due process case, has already considered the scope of the constitutionally protected interest in an individual's ability to follow a chosen trade or profession. In International Longshoreman's Ass'n, Locals 1416, et al. v. Miami-Dade County, 926 So. 2d 433 (Fla. 3d DCA 2006), plaintiffs challenged the county's temporary revocation of their port security clearances without process. Id. at 434. In concluding that no constitutionally protected interest was implicated by the county's summary action, we stated that "Appellants were not deprived of their right to engage in a chosen

19

trade or profession as they were not precluded from obtaining employment at another port facility." Id. at 436. A fortiori, the right claimed here will not support Appellants' claim of a violation of substantive due process. Cf. Ammons v. Okeechobee County, 710 So. 2d 641, 645 (Fla. 4th DCA 1998) (rejecting a claim of violation of substantive due process based on allegedly wrongful revocation of occupational license, as "[t]he denial of such a license does not prevent a business owner from pursing a lawful occupation," but "merely prevents the business from operating at a particular location") Appellants' allegations do not support a claim that they were prohibited from engaging in their chosen trade or profession or that they were unable to operate the Club at another location. Thus, to the extent Appellants' substantive due process claims are based on the right to pursue a chosen trade or profession, the trial court's order dismissing those claims with prejudice must be affirmed.

That being said, we do not agree with Appellants that their claims implicated a broad, and relatively undefined, right to pursue one's trade or profession. Instead, Appellants allege the serial misuse and abuse of the City's existing zoning, fire and tax regulations by City code enforcement officers. Properly described, Appellants' claims are based on the allegedly unfair and corrupt application of the City's zoning and other business regulations, and are therefore governed by the Eleventh Circuit's landmark en banc decision in McKinney and its progeny, an

analysis adopted by this Court and our sister Florida appellate courts. See Jacobi v. City of Miami Beach, 678 So. 2d 1365, 1366-67 (Fla. 3d DCA 1996) (adopting McKinney and its progeny for purposes of substantive due process analysis); see also, e.g., Ammons, 710 So. 2d at 645.

In McKinney, the plaintiff alleged that his pretextual termination by the board of county commissioners violated his right to substantive due process. 20 F.3d at 1355. The Eleventh Circuit, sitting en banc, receded from its prior precedent and held that the plaintiff had only procedural, not substantive, due process claims available to him when alleging harm based on an executive deprivation of a state-created right. Id. at 1558-59. In setting forth the new standard to govern substantive due process claims, the Eleventh Circuit stated that:

> areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Claus because "substantive due process rights are created only by the Constitution." As a result, these state law based rights constitutionally may be rescinded so long as the elements of procedural—not substantive—due process are observed.

Id. at 1556 (citation omitted) (quoting Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 229 (1985)). In its analysis, the Eleventh Circuit emphasized the distinction between "legislative" and "executive" actions when considering an alleged violation of substantive due process. Id. at 1557 n.9. Executive acts "apply to a limited number of persons . . . [and] typically arise from the ministerial

21

or administrative activities of . . . the executive branch" while legislative acts "generally apply to a larger segment of . . . society," such as laws and broad executive regulations. Id. "The analysis, and the substantive/procedural distinction . . . , that is appropriate for executive acts is *inappropriate* for legislative acts." Id. (emphasis in original). The court thus concluded that "in non-legislative cases, only procedural due process claims are available to pretextually terminated employees" and overruled its prior decisions to the extent they were contrary to the rule announced in McKinney. Id. at 1060.

In DeKalb Stone, Inc. v. County of DeKalb, Georgia, the Eleventh Circuit reiterated its holding in McKinney that "a plaintiff did not present a substantive due process claim when he alleged an executive deprivation of a state-created right." 106 F.3d 956, 960 (11th Cir. 1997). In DeKalb Stone, the plaintiff brought a substantive due process claim based on an alleged deprivation of the right to use its land as a nonconforming use under existing zoning laws. Id. at 958. The Eleventh Circuit stated that "land use rights, as property rights generally, are state-created rights" and that "enforcement of existing zoning regulations is an executive, not legislative, act." Id. at 959. Noting that McKinney's analysis had been applied to state education rights and state-created land use rights other than zoning regulations, e.g., issuance of a certificate of occupancy, the court in DeKalb Stone concluded that the plaintiff had alleged "an executive violation of a state-

created property right, not a deprivation of any constitutional right." Id. at 960. As a result, the plaintiff could not proceed on a claimed violation of substantive due process.

Indeed, claims similar to Appellants have been rejected in Eisenberg v. City of Miami Beach, 54 F. Supp. 3d 1312 (S.D. Fla. 2014). In Eisenberg, the plaintiff alleged that City code enforcement officials, including some of the same allegedly corrupt officials at issue in this case, embarked on a scheme to shut down the plaintiff's hotel using a series of code violation citations. Id. at 1316-19. As in this case, bribes were solicited by the City officials, but apparently the plaintiff in Eisenberg did not pay any of them. Relying on McKinney and its progeny, the court in Eisenberg concluded that plaintiff's substantive due process claim for constitutional deprivation of their liberty and/or property interests did not survive. See id. at 1325-27. That conclusion is consistent with the federal and Florida state courts that have considered and rejected substantive due process claims based on the enforcement or application of a host of land use, zoning, and other similar regulations. See, e.g., DeKalb Stone, 106 F.3d at 960 (rejecting a challenge to denial of nonconforming use exemption to local zoning laws); Boatman v. Town of Oakland, Florida, 76 F.3d 341, 346 (11th Cir. 1996) (rejecting a claim that town executives arbitrarily and capriciously refused to issue certificate of occupancy); Nantucket Enterprises, Inc. v. City of Palm Beach Gardens, No. 10-81549-CIV,

23

2013 WL 3927834, at *2, *7-9 (S.D. Fla. July 29, 2013) (finding no cognizable substantive due process claim for a corporate entity's eviction from a commercial leasehold based on allegations that the city improperly "red tagged" plaintiff for failing to obtain a certificate of occupancy, and that the city forced plaintiff out of the leasehold without a court order at the request of the purported owners and landlords of the property); Reserve, Ltd. v. Town of Longboat Key, 933 F. Supp. 1040, 1044 (M.D. Fla. 1996) (finding plaintiffs did not possess a cognizable substantive due process claim for their state-created property interest in a revoked building permit where "both the issuance and revocation of the building permit constitute 'executive' and not 'legislative' acts."); City of Pompano Beach v. Yardarm Restaurant, Inc., 834 So. 2d 861, 866-70 (Fla. 4th DCA 2003) (rejecting a substantive due process claim based on allegations that the city, as part of attempt to "kill" a restaurant's development project, improperly delayed issuing building permits, improperly revoked building permits, improperly delayed permitting reviews, and attempted to repeal an existing special exemption); Ammons, 710 So. 2d at 645 (rejecting a substantive due process claim based on revocation of commercial occupational license that had been improperly issued under existing zoning regulations); Jacobi, 678 So. 2d at 1366-68 (rejecting a substantive due process claim based on the city's refusal to allow reconfiguration of lots under municipal zoning regulations). These decisions are persuasive, and we find no

basis to vary from their conclusions.[9] Accordingly, we conclude that, regardless of whether time barred or not, Appellants failed to state a claim for a violation of substantive due process, and we affirm that aspect of the trial court's final order dismissing those claims with prejudice.

b. *Procedural Due Process*

To state a claim for violation of procedural due process, Appellants must allege "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Arrington v. Helms, 438 F.3d 1336, 1347 (11th Cir. 2006). As noted by the Eleventh Circuit in

---

[9] Appellants' reliance on Espanola Way Corp. v. Meyerson, 690 F.2d 827 (11th Cir. 1982) is unavailing. First, Espanola Way predates McKinney, and its application to a substantive due process claim in light of McKinney and its progeny is highly questionable. Second, it is unclear whether Espanola Way involved a claim asserting a violation of substantive due process, procedural due process, or perhaps, both. Indeed, in Post v. City of Fort Lauderdale, 7 F.3d 1552, 1560 (11th Cir. 1993), another pre-McKinney case, the Eleventh Circuit appeared to treat Espanola Way as relevant to a procedural due process claim. We note that in McKinney, the Eleventh Circuit acknowledged that a number of its prior decisions had not adequately distinguished between substantive and procedural due process rights, 20 F.3d at 1560, and in light of that we find Espanola Way to be of little persuasive value. Finally, to the extent that Espanola Way involved a claim relating to substantive due process and continues to have some persuasive value in light of McKinney, it appears that the actions in Espanola Way may have involved "legislative" and not "executive" actions, as the city commission was alleged to be taking action against an entire category of businesses. 690 F.2d at 828-29. In any event, as noted by the Eleventh Circuit in both Espanola Way and Post, the factual record in Espanola Way is too sparse to draw many conclusions from it. Simply put, Espanola Way cannot overcome the consistent conclusions of the courts applying McKinney, which supports the trial court's dismissal of the substantive due process claims with prejudice.

McKinney, deprivation of state-created rights that do not give rise to a claim for violation of substantive due process may nonetheless give rise to a claim for violation of procedural due process. 20 F.3d at 1556, 1560.

The City asserts that the lack of factual detail in the amended complaint regarding the sufficiency of process afforded to the Appellants, as well as discovery responses provided by Appellants, establishes that Appellants cannot maintain a claim for violation of their procedural due process rights. While that ultimately may be true, this matter came before the trial court via a motion to dismiss, and the City's argument relies too much on inferences drawn from silences in the Appellants' amended complaint and discovery responses outside the four corners of that pleading, which are more appropriately considered via summary judgment. We therefore conclude that the trial court erred in dismissing with prejudice Appellants' claims for violations of procedural due process arising from those injuries that are not time barred. We express no opinion regarding the merits of those claims, nor do we express any opinion regarding Appellants' ability, on remand, to amend their pleading with respect to those particular claims.[10]

---

[10] We note that this was only Appellants' first amended complaint. As is oft repeated one way or the other:

> As set forth in Florida Rule of Civil Procedure 1.190(a), "[l]eave of court [to amend a pleading] shall be given freely when justice so requires." While our courts have recognized that there is no "magic number" as to the number of amendments that should be allowed, under the

## IV. __CONCLUSION__

We deny the City's motion to dismiss the appeal. Regarding the merits, the trial court correctly concluded that Appellants' claims based on events that occurred before May 20, 2009 are time barred. In addition, regardless of when the injuries occurred, Appellants' claim for violation of their substantive due process rights fails to state a claim and was properly dismissed with prejudice as well. The trial court erred, however, in dismissing with prejudice Appellants' claim for violation of their procedural due process rights based on events that occurred after May 20, 2009 (or events for which no date is alleged in the amended complaint). Accordingly, we reverse and remand for further proceedings consistent with this opinion.

Affirmed in part; reversed in part.

SCALES, J., concurs.

---

facts of this case, the trial court should have afforded Annex the opportunity to amend its first amended complaint, particularly in light of the fact that the complaint had been amended only once. "Leave to amend should not be denied unless the privilege has been abused or the complaint is clearly not amendable."

Annex Indus. Park, LLC v. City of Hialeah, 218 So. 3d 452, 453 (Fla. 3d DCA 2017) (alterations in original) (quoting Osborne v. Delta Maint. & Welding, Inc., 365 So. 2d 425, 427 (Fla. 2d DCA 1978)).

27

EMAS, J., concurring in part and dissenting in part.

I join in that portion of the majority opinion reversing the trial court's dismissal of Appellants' claims for violation of their procedural due process rights, and affirming the dismissal of Appellants' claims for violation of their substantive due process rights.

However, I respectfully dissent from that portion of the majority opinion affirming the trial court's order to the extent it dismissed claims based on events occurring before May 20, 2009. I believe that Appellants have alleged a continuing tort sufficient to overcome a statute of limitations affirmative defense asserted at this stage of the proceedings.

Procedurally, the trial court entered its order at the motion-to-dismiss stage. We therefore review this order *de novo* and, as the majority acknowledges, we must accept the factual allegations in the complaint as true, and construe all well-pleaded allegations in a light most favorable to Appellants. See maj. op. at *2, n. 1. Applying that standard, I conclude that the trial court and the majority incorrectly concluded that, to the extent Appellants' claims are based on events that occurred before May 20, 2009, they are time barred.

The majority makes a valiant effort to parse out those events occurring before May 20, 2009 and those occurring after May 20, 2009. However, and

28

contrary to the majority's conclusion, the operative complaint does not merely allege a discrete or individual act or event engaged in by Appellees. Indeed, the complaint alleges an ongoing scheme, consisting of a course of conduct by Appellees which began with the harassment of Appellants through false and wrongful taxes, fines, penalties and closures; followed by extortionate demands of cash from Appellants to allow them to operate their business without harassment or false and wrongful taxes, fines, penalties and closures; and accompanied by threats to close down Appellants' business if they did not comply with the extortionate demands.

"A cause of action accrues when the last element constituting the cause of action occurs." § 95.031(1), Fla. Stat. (2013). Broadly speaking, in a suit for damages in tort, a cause of action generally accrues and the limitations period begins to run on the date when the plaintiff suffers injury. Sellers v. Miami-Dade Cty. School Bd., 788 So. 2d 1086, 1087 (Fla. 3d DCA 2001) (quoting Dep't of Transp. v. Soldovere, 519 So. 2d 616, 617 (Fla. 1988)). Under the continuing torts doctrine, however, where the tortious conduct is ongoing in nature, the cause of action does not accrue, and the statute of limitations does not begin to run, until the tortious conduct ceases. Effs v. Sony Pictures Home Entm't, Inc., 197 So. 3d 1243, 1244-45 (Fla. 3d DCA 2016); Pearson v. Ford Motor Co., 694 So. 2d 61 (Fla. 1st DCA 1997); Halkey-Roberts Corp. v. Mackal, 641 So. 2d 445, 447 (Fla.

29

2d DCA 1994); Spadaro v. City of Miramar, 855 F. Supp. 2d 1317, 1330 (S.D. Fla. 2012); Laney v. American Equity Inv. Life Ins. Co., 243 F. Supp. 2d 1347, 1357 (M.D. Fla. 2003). The continuing tort doctrine, as an exception to the statute of limitations, has long been recognized in Florida.  See Seaboard Air Line R.R. v. Holt, 92 So. 2d 169 (Fla. 1956); Suarez v. City of Tampa, 987 So. 2d 681 (Fla. 2d DCA 2008); Mackal, 641 So. 2d at 447.

Note that the premise for the continuing tort doctrine is not the continuing (or recurring) nature of the damages suffered, but rather the continuing or recurring nature of the tortious conduct:  "A continuing tort 'is established by continual tortious *acts*, not by continual harmful effects from an original, completed act.'" Suarez, 987 So. 2d at 686 (quoting Horvath v. Delida, 540 N.W. 2d 760, 763 (Mich. App. 1995)).

This court's decision in Effs, 197 So. 3d at 124, is instructive.  There, we held that the continuing torts doctrine did not apply to an action for tortious interference with a business relationship, relying in part upon decisions from other jurisdictions:

> Assuming that [the defendant] unjustifiably interfered with [the plaintiffs'] business relationship, [the defendant's] tortious conduct was complete when it induced or caused the breach. The wrong, therefore, was not continuing. The damage or injury that had been inflicted may have continued to develop during successive tax periods, but it did not result from repeating wrongful conduct.

Id. (quoting D'Arcy & Assocs., Inc. v. K.P.M.G. Peat Marwick, L.L.P., 129 S.W. 3d 25, 30 (Mo. Ct. App. 2004)) (emphasis added). See also Bankcard Sys., Inc. v. Retriever Indus., Inc., 2003 WL 204717, *7 (Tex. App. Jan. 30, 2003) (cited with approval in Effs, 197 So. 3d at 124, as "declining to apply the continuing tort doctrine to the plaintiffs' claim for tortious interference with a business relationship where there is no 'ongoing wrong'; noting that the 'continuing loss of residual fees that may have resulted from that alleged wrongful conduct does not toll the statute of limitations'").

I would agree with the majority that the continuing torts doctrine would not apply in this case if the complaint merely alleged an "original, completed act," resulting in "continual harmful effects." See Suarez, 987 So. 2d at 686. However, that is not the case. Rather, the instant complaint alleges an ongoing course of conduct, and a series of interrelated and recurring acts perpetrated by Appellees, leading ultimately to the loss of Turgman's business.

Specifically, the operative complaint alleges:

- "[A] long-standing and persistent pattern and practice of extortion, bribery, and harassment [of plaintiffs] by the City of Miami Beach";

- Actions by the City, through its government officials, which for years "has levied unlawful taxes, fines, penalties, and business closures on victims who refuse to go along with the City's demands";

31

- The "harassment that the City of Miami Beach inflicted on Plaintiffs was the subject of a nearly year-long undercover FBI investigation that produced wiretaps, video, and audio recording evidence—all of which was marshalled and presented by the United States Attorney's Office for the Southern District of Florida culminating in the prosecution and sentencing of all of the individual defendants, and the resignation of Miami Beach City Manager Jorge Gonzalez";

- In January 2006 Turgman created 1501 Ocean Drive, LLC to purchase the Club property, and incorporated Chakra 5, Inc. as the operational entity for the Club. Turgman capitalized 1501 Ocean Drive, LLC with $2 million from his personal finances;

- In March 2006, 1501 Ocean Drive, LLC completed its purchase of the Club for $5.6 million (Turgman's $2 million plus a loan of $3.6 million by Citrus Bank (and secured by the Club property));

- The Club opened in Miami Beach in December 2006 as a restaurant, nightclub and entertainment complex. Following the Club's opening, "the City immediately began harassing the Club with successive, pre-textual inspections by the City's code Compliance Department";

- "At midnight on January 26, 2007, the City shut down the Club for being open past midnight even though the conditional use permit authorized the

32

Club to be open until 5 a.m. The City required Turgman to pay an additional $3,445.00 to operate until 5:00 a.m.";

- "Beginning the Friday night of Super Bowl weekend, the harassing inspections started and continued incessantly";

- By the summer of 2007, Turgman concluded that the harassment from the City was going to eventually cause the Club to fail;

- Believing that the City's harassment was the result of Turgman's involvement in the venture, he eventually assembled a management team to take over the Club's operation and changed the name of the Club to Dolce Ultra Lounge;

- However, in September 2008, City officials discovered that Turgman was still the owner of the facility and was operating the nightclub, and "[t]he inspections immediately returned to their previous harassing levels";

- In November 2008, the City improperly issued a cease and desist order, prohibiting the Club from operating. The Club was forced to close during the holiday season, and Turgman hired a contractor to perform additional work to obtain authorization for the Club to reopen;

- In November and December 2008 Turgman sent a letter to the City Attorney and to City officials, complaining of the improper cease and desist order and closure of the Club;

33

- "From that point (December 2008) forward, the City monitored every event held at the Club. As soon as the Club's doors would open, code inspectors would be there. In many instances, Turgman was orally told not to let people in, and in some cases the inspectors would just shut the Club down";

- As a result of the City's conduct, Turgman and the Club lost substantial income and forced to reopen the Club as an events-only rental facility;

- "In February 2010, Turgman contracted with a gay rights fundraising organization to hold its annual fundraiser party at the Club. Before the event, City officials contacted the event organizers and warned them that the City would shut the Club down on the night of the party";

- Turgman met with the City's Chief Finance Officer to ask why the City would shut the Club down, and was told the Club "owed the City $36,000 in back resort taxes and the only way that the Club would be allowed to continue operating would be to pay the City immediately";

- Turgman requested an itemized list of the monies owed to the City, but the Chief Finance Officer refused his request. Ultimately, and "desperate for the income the event would generate in light of years of the City's misconduct, [Turgman] entered into a payment plan . . . to pay the City";

- "In March 2010, the Winter Music Conference organization contracted with Turgman to have an awards ceremony at the Club . . . . Thousands attended. Over a month after the event took place, Turgman received a citation for $1800 for flyer violations." Turgman called the City regarding the fine and was advised to pay $125 and write a letter to the Special Master;

- On June 3, 2011, following a Memorial Day Weekend event at the Club, Turgman called to follow up on the status of the $1800 fine from the 2010 event. He spoke with the City's Lead Code Compliance Officer, Jose Alberto. "Alberto told him that he needed to speak with him in person immediately because Chakra 5, Inc. was going to be assessed a $50,000 fine for flyers related to the Memorial Day weekend party";

- Alberto came to Turgman's office and "told him that he could take care of the fines for $3000, which he would use to take care of 10-11 of 'his guys'";

- "The following Monday, June 6, 2011, Alberto called Turgman and told him that the situation was worse than he [Alberto] had thought and that they needed to meet right away";

- Alberto came to the Club "and told Turgman that the fines were likely to be around $60,000"; "Alberto demanded $3,000 again, but made it clear

the payment needed to be in cash and paid directly to him by Friday, June 10." Turgman asked for Alberto to give him until Monday, June 13, and Alberto agreed;

- "The following day, June 7, 2011, Alberto appeared again at the Club. Alberto told Turgman that the City of Miami Beach officials despised Turgman and wanted the Club shut down." Turgman assured Alberto that he would pay the $3,000 by June 13;

- On June 9, 2011, Turgman reported the incident to the FBI;

- Thereafter, Turgman began assisting the FBI in an investigation into corruption in the City's Code Compliance Division. His assistance included wearing a recording device for future meetings with Alberto;

- On June 11, 2011, Turgman met with Alberto at the Club, where their meeting was monitored and recorded by the FBI. At the meeting, Turgman gave Alberto $2,500 and begged Alberto not to allow the Club to be shut down. "Alberto then assured Turgman that there would be no further problems with fines from the flyers";

- Shortly thereafter, Alberto and Turgman reached an agreement by which Turgman "would pay Alberto $1,500 every Monday, or $1,000 if he was open only on Friday night." The weekly meetings were monitored and recorded by the FBI;

36

- In the weeks that followed, Turgman made numerous extortionate payments to Alberto in exchange for allowing Turgman to continue "operating without any unwarranted inspections or fines from the City Code Compliance Department";

- In August of 2011, the FBI brought in an undercover agent, posing as the manager of the Club, to make the payments to Alberto, relieving Turgman of that responsibility and the accompanying stress and anxiety from participating in the investigation;

- "The City acted with the goal of causing the business of the Club to fail."

- Plaintiffs were told "by the City's Lead Code Compliance Inspector Jose Alberto that City officials wanted the Club to be permanently put out of business and that he had been directed to use the Code Compliance Division to do whatever was necessary to achieve that goal";

- As a result of the actions of the City and City officials, the $3.6 million loan to the Club went into default in 2010, and ultimately Citrus Bank took possession of the Club, and was sold at auction in May 2012;

- "The Club failed as the proximate result of being targeted by the City of Miami Beach";

- "The City's conduct proximately caused Plaintiffs to suffer damages, including but not limited to, the payment of fraudulent fines to the City of Miami Beach, payment of fraudulent tax bills to the City of Miami Beach, lost profits, and loss of the Club";

- In 2012, "each of the Individual Defendants confessed to participating in the scheme to extort Plaintiffs";

- Also in 2012, defendants "Jose Alberto, Willie E. Grant, Orlando E. Gonzalez, Ramon D. Vasallo, Vicente L. Santiesteban, Henry L. Bryant, and Chai D. Footman were arrested on charges of conspiracy to commit extortion and attempt to commit extortion for their involvement in the extortion of Plaintiffs";

- "All of the Individual Defendants have been prosecuted and sentenced";

- It was the custom or practice of the Defendant City of Miami Beach to allow its officials and employees to coerce and harass Miami Beach businesses into paying illegal bribes and extortion monies to the City, City officials, and City employees, and to provide goods and services to City officials and City employees free of charge or at a substantially reduced rate";

- "Under this custom or practice, the City's final policy makers—the City Commission and former City Manager Jorge Gonzalez—delegated their

final policymaking authority to subordinate code inspectors and other City officials";

- "Under this custom or practice, subordinate City code inspectors and other City officials used their final policy making authority to harass business owners by conducting Code inspections at harassing times or intervals, issuing unwarranted or excessive finds, issuing fraudulent tax bills, improperly exercising discretionary decision making for the purpose of delaying or denying permits, reducing allowed occupancy levels, and improperly ordering clubs to close."

Accepting the above allegations as true, the four corners of the complaint set forth a continuing tort, and the law dictates (at least at this stage of the proceedings below) that the statute of limitations does not bar the action or any portion thereof. The trial is generally the appropriate venue for making the fact-intensive determination of whether Appellees engaged in a continuing tort, and thus whether the affirmative defense of the statute of limitations bars any portion of Appellants' claims. See, e.g., Goodwin v. Sphatt, 114 So. 3d 1092, 1094 (Fla. 2d DCA 2013) (recognizing that the continuing torts doctrine, as an exception to a statute of limitations defense, "presents a factual question that would also preclude dismissal of the complaint"); Mackal, 694 So. 2d at 68-69 (holding: "Whether the continuing torts doctrine applies to the facts of a case is for a trier of fact to decide"); Halkey-

39

Roberts, 641 So. 2d at 447 (reversing summary judgment and holding that the "question of whether [defendant's] actions constituted continuing torts precludes the granting of summary judgment as to counts I and II. To what extent, if any, the concept applies to this case is an issue for the trier of fact to decide.")

We do not and cannot know whether the evidence may ultimately bear out the allegations of a continuing tort. But our review at this stage depends not on ultimate proof, but upon the allegations of the complaint. Accepting those allegations as true—as we must—Appellants have sufficiently alleged a continuing tort such that the trial court erred in dismissing claims based on events occurring before May 20, 2009 (i.e., more than four years before the filing of the complaint). I would reverse that portion of the trial court's order.

I therefore respectfully concur in part and dissent in part.